**Nathan MORRIS, Plaintiff,**

v.

**NORTH HAWAII COMMUNITY HOSPITAL and Adventist Health, Defendants.**

**No. 99–00051 DAE.**

United States District Court, D. Hawaii.

March 17, 1999.

Matthew J. Viola, Simons & Ichinose, Honolulu, HI, for Nathan L. Morris, plaintiff.

Elizabeth B. Croom, Legal Aid Society of Hawaii, Kailua Kona, HI, for North Hawaii Community Hospital, defendant.

William N. Ota, Robbins & Rhodes, Davies Pacific Center, Honolulu, HI, for Adventist Health, defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

DAVID ALAN EZRA, Chief Judge.

The court heard Plaintiff's Motion on March 15, 1999. David F. Simons, Esq., and Elizabeth B. Croom, Esq., appeared at the hearing on behalf of Plaintiff; Kenneth S. Robbins, Esq., and Charla J.H. Murakami, Esq., appeared at the hearing on behalf of Defendant North Hawaii Community Hospital, Inc.; David Suzuki, Esq., appeared at the hearing on behalf of Defendant Adventist Health. After reviewing the motion and the supporting and opposing memoranda, the court GRANTS Plaintiff's Motion for Preliminary Injunction.

### BACKGROUND

This case arises from the termination of Plaintiff Nathan Morris's ("Plaintiff") home health care benefits. Plaintiff is a 40-year-old quadriplegic who was injured in a 1994 automobile accident. The Social Security Administration has determined that Plaintiff is permanently disabled. Plaintiff became eligible for Medicare benefits in 1997.

### I. Medicare

Medicare is a federally funded program that provides medical insurance benefits to certain disabled or elderly individuals who qualify for Social Security benefits. 42 U.S.C. § 1395 et seq. Medicare is administered by the Health Care Financing Administration ("HCFA") of the United

States Department of Health and Human Services. Medicare is comprised of two principal components: Part A covers inpatient hospital benefits and home health care; Part B covers physician and other outpatient services. Individuals eligible for Medicare automatically receive Part A coverage, while Part B coverage requires individuals to pay a monthly premium.

Medicare payments for covered services may only be made to certified providers. Home health agencies are not required to participate in Medicare. However, if they elect to do so, they agree as a condition of payment to comply with federal conditions of participation and all applicable federal and state laws.

In August of 1997, President Clinton signed into law the Balanced Budget Act of 1997, P.L. 105–33, which, among other things, substantially amended the Medicare Act. The new law included changes in the way Medicare will reimburse home health agencies for providing home health services to the program's beneficiaries. The changes establish a "prospective payment system" ("PPS"). Under the PPS, providers will ultimately receive predetermined payment amounts limited by episode of illness, as well as the opportunity for providers to share in savings to the extent they keep their costs below the prescribed payment amount. The new system was scheduled to go into effect in October of 1999, but has been delayed indefinitely due to year 2000 complications.

In the meantime, Medicare instituted an "interim payment system" ("IPS"). The IPS continues to pay on a fee-for-service basis, but caps the total amount that Medicare will pay an agency for any one patient. Plaintiff contends that KHHC's IPS became effective on January 1, 1998 and that because KHHC would no longer realize a profit from rendering services to Plaintiff, he was "dumped" shortly thereafter. Subsequently, Nancy–Ann Min De-

Parle, the administrator of HCFA, sent a letter to all Medicare certified home health agencies stating that, in light of the IPS, HCFA is "alarmed by reports ... that some [home health agencies] may be terminating care for Medicare enrollees and blaming the payment reforms."

II. *Plaintiff's Discharge*

Prior to Plaintiff's eligibility for Medicare in June 1997, his wife, Lucille Morris, provided all of his care. Mrs. Morris, however, injured herself while moving Plaintiff. She underwent back surgery in November 1997 and is no longer able to lift heavy objects, including her 190–pound husband.

Plaintiff is confined to bed unless he has assistance transferring to his electric wheelchair. Additionally, Plaintiff requires skilled nursing services to monitor, irrigate, and change his catheter and to assess the condition of his skin. He requires maximum assistance with all of his daily living activities, including bathing, feeding, toileting, brushing his teeth, skin care, range of motion exercises and massage, and personal hygiene.

Defendants Kohala Home Health Care of North Hawaii Community Hospital[1] and Adventist Health, the owner, operator and/or manager of Kohala Home Health Care, (collectively "KHHC") provided Medicare-covered home health services to Plaintiff from June 5, 1997 through March 19, 1998. At all times, KHHC rendered services to Plaintiff as prescribed by Dr. Sylvia Sonnenschein's Plan of Care. Dr. Sonnenschein, Plaintiff's physician, updated Plaintiff's Plan of Care every two months. Each Plan of Care, including the one in effect at the time Plaintiff's services were terminated, indicated that Plaintiff remained homebound and in need of skilled nursing and aide assistance.

---

1. Prior to November 1, 1997, Kohala Home Health Care was not affiliated with North Hawaii Community Hospital, Inc. As of November 1, 1997, the agency was purchased by North Hawaii Community Hospital, Inc. and became known as Kohala Home Health Care of North Hawaii Community Hospital.

However, on February 20, 1998, Fran Woollard, Director of Nursing for KHHC, informed Plaintiff that his services were being terminated. Plaintiff alleges that during this conversation, he requested written notice of his discharge. In response, Plaintiff contends that Ms. Woollard informed him that he was being discharged because of Medicare cutbacks and that his services would be gradually reduced and then completely terminated on March 28, 1998.

On March 2, 1998, Plaintiff states that another KHHC nurse, Christine Richardson, told him that his services would be reduced and then terminated. Again, Plaintiff alleges that he requested written notice of this determination. In response, Plaintiff states that KHHC gave him a photocopy of a National Association for Home Care newsletter article, discussing the interim payment system and per beneficiary limits imposed under the Balanced Budget Act of 1997. Ms. Richardson's Monthly Summary Report, dated March 2, 1998, also shows that Plaintiff was told that he was being terminated due to "Medicare cutback of aide support." This Monthly Summary Report further states that Plaintiff continues to require maximum assistance with all activities of daily living and that his wife is unable to provide his care due to a permanent back injury.

Finally, on March 5, 1998, Plaintiff alleges that he called Ms. Woollard and again requested a written notice of his termination. In response, Plaintiff maintains that Ms. Woollard threatened to reclassify Plaintiff's homebound status and terminate his services immediately if he persisted with his request for written notice.

On March 19, 1998, KHHC discharged Plaintiff. KHHC denies that the termination of Plaintiff's services was related to Medicare cutbacks. Instead, KHHC maintains that Plaintiff was observed outside of his home on several occasions, indicating that he was no longer "homebound." KHHC contends that Plaintiff's non-medically related absences from home render him ineligible to receive Medicare-covered home health care. Plaintiff's Discharge Summary, prepared by Ms. Woollard on March 20, 1998, indicates that Plaintiff was discharged because he was no longer homebound. Despite Plaintiff's requests, he did not receive written notification of his discharge until Carolyn Quick, an administrator for KHHC, wrote to Plaintiff on March 25, 1998.

On May 12, 1998, Plaintiff's attorneys reviewed his patient file. They allege that, since that time, 3 notes have been added to his file purportedly documenting that KHHC employees had seen, or heard about, Plaintiff being outside of his home. Each of the 3 notes is dated on or before March 19, 1998, Plaintiff's date of discharge.

KHHC alleges that it attempted to arrange other care for Plaintiff prior to his discharge. KHHC advised Plaintiff to apply for state Medicaid services through an agency called Nursing Home Without Walls ("NHWW"). Plaintiff contends that KHHC's interest in his receiving NHWW services evidences its financial motive, as KHHC would receive far more for Plaintiff's care from NHWW than it would from Medicare. In any event, Plaintiff asserts that he does not qualify financially for such services.

KHHC also contends that Plaintiff's wife had recovered from back surgery and would be able to care for Plaintiff with family assistance. KHHC's March 2, 1998 Monthly Summary Report, however, indicates that "spouse has permanent back injury and is unable to lift."

Since Plaintiff's discharge, Dr. Sonnenschein and her staff have made home visits to change his catheter and to monitor for skin breakdown. Because Dr. Sonnenschein's services are not covered by Medicare, Plaintiff is billed personally. Plaintiff contends he is unable to afford the cost of private care. On June 22, 1998, Dr. Sonnenschein signed an order reinstating Plaintiff's services with KHHC. This physician's order was sent to KHHC under cover of a letter from the Legal Aid Soci-

ety of Hawaii dated July 9, 1998. This letter to KHHC also included a demand that KHHC submit Plaintiff's bills to Medicare for its determination of Plaintiff's eligibility for home health services. KHHC responded by letter dated August 27, 1998, refusing both to follow Dr. Sonnenschein's order and to submit a bill to Medicare because KHHC had no unpaid bills to submit.

Without the care provided by his home health care plan, Plaintiff alleges that he is in danger of injury, skin breakdown, bowel compaction, and infection of his catheter. He also maintains that he is in danger of physical and psychological harm, having threatened suicide at least once since his discharge. Furthermore, Plaintiff contends that due to his remote location in North Hawaii, KHHC is the only home health care agency that can accommodate his needs.

On January 26, 1999, Plaintiff filed the instant action, alleging claims for breach of contract, tortious breach of contract, violations of Section 504. of the Rehabilitation Act, unfair or deceptive trade practices, spoliation of evidence, and punitive damages. Also on January 26, 1999, Plaintiff filed a Motion for Preliminary Injunction, requesting 1) that KHHC reinstate his home health care services; 2) that KHHC be restrained from reducing, terminating or interrupting his services except in compliance with Medicare conditions of participation, state regulations governing home health agencies and other existing laws; and 3) that KHHC be enjoined from discriminating and/or retaliating against Plaintiff on the basis of his disability and/or his assertion of claims against KHHC.

## STANDARD OF REVIEW

■ Motions for preliminary injunction may be brought under Rule 65 of the Federal Rules of Civil Procedure. The traditional equitable criteria used in determining whether to grant a preliminary injunction are: 1) the likelihood of the moving party's success on the merits; 2) the possibility of irreparable injury to the moving party if relief is not granted; 3) the extent to which the balance of hardships favors the respective parties; and 4) in certain cases, whether the public interest will be advanced by granting the preliminary relief. *Miller v. California Pacific Medical Ctr.,* 19 F.3d 449 (9th Cir.1994) (citing *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987)). *Miller* states that the moving party must show "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits." *Miller,* 19 F.3d at 456 (quoting *Senate of California v. Mosbacher,* 968 F.2d 974, 977 (9th Cir.1992)).

## DISCUSSION

### I. *Jurisdiction*

#### a. *Section 504 of the Rehabilitation Act*

KHHC challenges the court's subject matter jurisdiction. Plaintiff asserts that this action has been brought "pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 704[sic] ), the Hawaii Consumer Protection Act, the Hawaii contract law, various other State and Federal statutes, rules, and regulations, as well as the common law." KHHC contends that if the § 504 claim is not justiciable, the court will be without supplemental jurisdiction to hear any state law claims.

■ Section 504 states, in pertinent part:

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794. To state a claim under § 504, Plaintiff must allege: (1) he is an

"individual with a disability"; (2) he is "otherwise qualified" to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance. *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir.1997).

■ In this case, Plaintiff has alleged, and KHHC does not deny, that his quadriplegia constitutes a disability. Both parties also agree that KHHC is subject to § 504 as the recipient of federal Medicare funds. The parties disagree, however, as to whether Plaintiff is "otherwise qualified" and if so, whether he was denied services due to his disability. Contrary to KHHC's suggestion, however, Plaintiff need not prove his claim at this stage in order to invoke federal jurisdiction. Rather, he need only allege facts sufficient to support each element of the claim. Because Plaintiff has adequately alleged both that he is "homebound" within the meaning of Medicare's regulations and that KHHC terminated his services due to his disability and its concomitant loss of profits, the court has jurisdiction to resolve the disputes.[2]

b. *Exhaustion of Administrative Remedies*

■ KHHC next argues that Plaintiff's § 504 claim should be dismissed because Plaintiff has not received an administrative determination of his actual homebound status, which KHHC alleges he needs in order to prove he is "otherwise qualified." This argument is unavailing, however, because the Ninth Circuit has expressly stated that § 504 does not require the exhaustion of remedies. *Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern Cal.*, 719 F.2d 1017, 1021 (9th Cir.1983); *see also Smith v. Barton*, 914 F.2d 1330, 1339 (9th Cir.1990) (holding that private plaintiffs suing under § 504 need not first exhaust administrative remedies).

Now acknowledging that exhaustion of administrative remedies is not required for "certain § 504 claims," KHHC nevertheless argues that because the court would not have jurisdiction under the Medicare Act, in the absence of a determination by the Secretary of Health and Human Services ("the Secretary") of Plaintiff's homebound status, the court likewise should not have jurisdiction in this case until such a determination is made. This argument misunderstands the crux of Plaintiff's complaint. This case is not brought under the Medicare Act. Plaintiff is not seeking an award of Medicare benefits. Rather, Plaintiff seeks to prevent the termination of his services based on an improper or discriminatory criterion, that is, heavy utilization of services resulting from his disability. Plaintiff is not seeking to challenge an administrative decision by the Secretary. The Secretary did not terminate Plaintiff's services; KHHC did. Because Plaintiff challenges the allegedly discriminatory actions of KHHC, not those of the Secretary or her intermediary, the court concludes that Plaintiff's § 504 discrimination challenge does not require a prior determination by the Secretary of his homebound status.

Although KHHC alludes to Plaintiff's § 504 claim as having "obviated his need to go through the established administrative process," Plaintiff could not have filed his current claims under the Medicare Act. As the Supreme Court noted in *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), a claim can be filed for scrutiny by the Secretary only *after* the medical service for which payment is sought has been furnished. Plaintiff cannot seek to recover Medicare benefits for services which KHHC refuses to provide.

II. *Preliminary Injunction*

■ Because the court concludes that it has subject matter jurisdiction, the next

**2.** KHHC correctly notes that because the court has federal question jurisdiction over the § 504 claim, the court may exercise sup-

plemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's remaining claims.

step is to decide whether a preliminary injunction is warranted. In order to determine the appropriateness of a preliminary injunction, the court must consider the likelihood of Plaintiff's success on the merits; the possibility of irreparable harm; the balance of hardships; and, whether the public interest will be advanced by granting the preliminary relief.

### a. Likelihood of Success on the Merits

KHHC disputes the likelihood of Plaintiff's success on the merits. In order to prevail on the § 504 claim, Plaintiff must prove that he is otherwise eligible to receive Medicare-funded services from KHHC. The determination of whether Plaintiff is otherwise eligible depends on whether he is "homebound." 42 U.S.C. § 1395f(a) defines homebound as follows:

> ... an individual shall be considered to be "confined to his home" if the individual has a condition, due to an illness or injury, that restricts the ability of the individual to leave his or her home except with the assistance of another individual or the aid of a supportive device (such as crutches, a cane, a wheelchair, or a walker), or if the individual has a condition such that leaving his or her home is medically contraindicated. While an individual does not have to be bedridden to be considered "confined to his home", the condition of the individual should be such that there exists a normal inability to leave home, that leaving home requires a considerable and taxing effort by the individual, and that absences of the individual from home are infrequent or of relatively short duration, or are attributable to the need to receive medical treatment.

42 U.S.C. § 1395f(a). To assist home health agencies in interpreting the statute, HCFA published guidelines that provide, in pertinent part, as follows:

> Some examples of homebound patients which are illustrative of the factors to be taken into account in determining whether a homebound condition exists would be: (1) a beneficiary paralyzed from a stroke who is confined to a wheelchair or who requires the aid of crutches in order to walk; (2) a beneficiary who is blind or senile and requires the assistance of another person in leaving his place of residence; (3) a beneficiary who has lost the use of his upper extremities and, therefore, is unable to open doors, use handrails on stairways, etc., and, therefore, requires the assistance of another individual in leaving his place of residence....

HCFA Publication 11, § 204.1.

Plaintiff has produced considerable evidence that he is homebound. First, his quadriplegia clearly restricts his ability to leave his home without substantial assistance. Plaintiff states, and KHHC does not dispute, that he is unable to leave his bed without the assistance of another individual. Likewise, he cannot leave his house without the aid of both another individual and his powered wheelchair. Second, leaving home requires a considerable and taxing effort. Plaintiff estimates that before he can leave the house to visit his doctor, 1 ½ hours of effort are required. Consequently, Plaintiff states that he has only been to Dr. Sonnenschein's office once. Furthermore, Plaintiff contends that such extreme effort is required to transfer him to and from his wheelchair that he is currently only able to have a shower once every ten days. Finally, Plaintiff's absences from home appear to be infrequent or of relatively short duration.

KHHC focuses the weight of its argument on Plaintiff's several absences from home. Several KHHC employees and other Hawi area residents have stated that they have seen Plaintiff in his wheelchair outside of his home on a number of different occasions. Although KHHC argues that the court must consider Plaintiff's absences, the factual record regarding the various sightings of Plaintiff does not reflect that his absences were either lengthy or frequent. At most, the statements offered by KHHC demonstrate that occasionally Plaintiff was seen outside his

home. Furthermore, the testimony offered by Lucille Morris during the preliminary injunction hearing indicates that Plaintiff leaves his home 3 to 4 times per month for approximately an hour or two at a time.

The duration and frequency of Plaintiff's absences from home are unlike those of the individuals classified as "non-homebound" in the cases cited by KHHC. In *Labossiere v. Sec. of Health and Human Services*, 1991 WL 531922 (D.Vt.1991), the plaintiff was able to leave her home 3–4 days per week, for periods of time up to eight hours. In *Pope v. Sec. of Health and Human Services*, 1991 WL 236173 (D.Vt. 1991), the court found that the plaintiff's absences from home, although infrequent, did not require "considerable and taxing effort." Finally, in *Richardson v. Shalala*, 1995 WL 441956 (D.Vt.1995), the individual was classified as non-homebound due to her regular thrice-weekly six-hour visits to an adult day care center.

Language in another case cited by KHHC actually bolsters Plaintiff's position. In *Burgess v. Shalala*, 1993 WL 327764 (D.Vt.1993), the court recognized that "Congress chose to define the phrase 'confined to home' to include claimants who are able to travel outside the home on an infrequent basis ... [including] those who 'could ... leave home for such nonmedical purposes as an infrequent family dinner, an occasional drive or walk around the block, or a church service....' The obvious thrust is that the definition of 'confined to home' should not serve to imprison the elderly [or disabled] by creating the penalty of loss of Medicare benefits for heroic attempts to live a normal life."

Moreover, Plaintiff's condition closely matches the conditions of those identified in HCFA's guidelines as being homebound. Like the examples, Plaintiff is paralyzed and confined to a wheelchair. He has no use of his upper (or lower) extremities and is unable to open doors, use handrails on stairways, etc. and, therefore, requires the assistance of another individual in leaving his place of residence.

Therefore, because Plaintiff has produced substantial evidence that he is homebound, the court finds this factor tips slightly in Plaintiff's favor.

### b. *Irreparable Harm*

This factor, also, favors Plaintiff. Plaintiff states that he is unable to pay privately for home health care services and that he is ineligible for state Medicaid/NHWW assistance. Lack of home health care poses a serious risk to Plaintiff's physical and psychological well-being. Moreover, injunctive relief is appropriate because Plaintiff has no plain, adequate and speedy remedy at law.

### c. *Balance of Hardships*

The balance of hardships weighs in Plaintiff's favor. The risk to KHHC, if any, is financial. KHHC contends that it risks exposure to Medicare fraud if it provides services to Plaintiff for which it knows him to be ineligible. However, Medicare has not declared Plaintiff ineligible. In fact, at no time has Medicare refused to pay for services rendered to Plaintiff. Moreover, the court's determination of Plaintiff's eligibility insulates KHHC from fraud exposure. That is, if Plaintiff is eligible for services, KHHC will not be providing him with services for which he is ineligible. Finally, any financial risk to KHHC is outweighed by the serious health risks to Plaintiff.

### d. *Public Interest*

As recognized by both parties, the nation has made an enormous financial commitment to the funding of the Medicare program. The public has a clear and unmistakable interest in ensuring that those who are entitled to Medicare benefits receive them. KHHC correctly points out that the public also has an interest in making sure that *only* those who are eligible receive such benefits. In this case, however, because the court concludes that Plaintiff is likely to be found "otherwise eligible," the public interest is clearly

served by continuing Plaintiff's home health care benefits. Additionally, the public also maintains an interest in requiring federally-funded programs to render services in a non-discriminatory manner.

Based on the foregoing, the court GRANTS Plaintiff's Motion for Preliminary Injunction because it concludes that Plaintiff has produced substantial evidence that he is homebound, there is a high probability of irreparable harm to Plaintiff if injunctive relief is not granted, the balance of hardships sharply favors Plaintiff, and the public interest will be served. The court hereby orders KHHC to reinstate home health services for Plaintiff, as prescribed and ordered by his treating physician, Dr. Sonnenschein. KHHC is restrained from reducing, terminating or interrupting the Medicare home health services of Plaintiff except in compliance with Medicare conditions of participation, state regulations governing home health agencies and other existing laws. Finally, KHHC and its employees are enjoined from discriminating and/or retaliating against Plaintiff on the basis of his disability and/or his assertion of claims in this lawsuit.

### CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's Motion for a Preliminary Injunction.

IT IS SO ORDERED.